IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 3:15-9031 |
| CAPSTONE PEDIATRICS, PLLC, ) | Chapter 11 |
| ) | Judge Randal S. Mashburn |
| Debtor. ) | |

## CAPSTONE PEDIATRICS, PLLC - COMPANY PROFILE

Capstone Pediatrics, PLLC (the "Debtor") files this statement of its company profile[1] in support of motions to be filed in this case, to expressly include the "first day" motions filed contemporaneously herewith. To avoid unnecessarily lengthy motions that recite the Debtor's profile and background, the Debtor intends to reference and incorporate this *Notice of Filing Company Profile* in current and future motions.

### I. Summary of Basis for Chapter 11 Filing

On October 31, 2013, the Debtor acquired the assets of a pediatric practice that was being dissolved after its owner was investigated (and later indicted and convicted) of health care fraud. Based on its due diligence, the Debtor believed it paid fair market value for the assets it received in exchange. Unfortunately, upon acquisition, the Debtor realized that it paid too much for receiving too little. And what it did receive was fraught with compliance issues, IT issues, manpower issues, and oppressive contracts (to specifically include leases) with rental rates in excess of fair market value. The Debtor has also engaged in a vaccine purchase program that resulted in overpaying for its vaccines. In addition, the Debtor has concluded that although it would prefer to operate in twelve locations throughout Middle Tennessee, the profitability and

---

[1] The Debtor expressly reserves its right to supplement and amend this profile. It is based on information available to counsel at the time of filing. The filing in this case was expedited based on the prospective termination of services provided by Athenahealth. Due to the emergency nature of this filing, the Debtor intends to provide additional information to its creditors throughout the reorganization process.

sustainability of the Debtor require it to reduce its number of operating locations. This is expected to result in reduced revenue, but it the accompanying reduction in expenses will make the Debtor a financially stronger and more viable business.

The Debtor has been working for a number of months to streamline its operations and prepare for a restructuring. The Debtor had defaulted on certain leases and attempted to modify the lease terms. Its lease rates currently comprise approximately 18% of its net revenue. The Debtor intends to reduce this number to an amount that is comparable within the industry. In addition, the Debtor could not timely pay various venders. The arrearages could not be cured, and working out resolutions with the Debtor's creditors could not be accomplished through and out-of-court restructuring.

Most importantly, the timing of the Chapter 11 was dictated by software service provider Athenahealth. Athenahealth provides integrated health care solutions in the health care industry. This includes providing electronic health records, medical billing, patient engagement, order transmission, revenue cycle management, and patient access and care coordination. Athenahealth has been recognized as a leader in software practice management, and is absolutely vital to the Debtor's operations. Without Athenahealth's services, patient care would stop and the Debtor could not operate. In this case, the Debtor does not dispute that it owes Athenahealth approximately $350,000 in past due billings (which equates to roughly 3-4 months of service). The Debtor desired to renegotiate its terms and fold the arrearage into a new contract with Athenathealth. These negotiations were unsuccessful, and the Debtor received notice that on or about December 23, 2015, Athenahealth would terminate its service. This would have resulted in catastrophic, and unrecoverable financial damage to the Debtor. Filing the Chapter 11 was

necessary to preserve the Debtor as a going concern, to maximize the value of the Debtor's bankruptcy estate, and to provide as much of a return as possible to the Debtor's creditors.

## II.     Overview of Capstone Pediatrics, PLLC

The Debtor is one of the largest independent privately held pediatric practices in the Middle Tennessee region. Its mission to deliver personalized, quality care to improve and maintain its patients' health and wellbeing. The Debtor employs 25 board certified pediatricians and 25 certified nurse practitioners, and has between 40,000 and 50,000 patients. In 2014, it experienced gross revenues of $24,858,435, and patient visits of approximately 144,000.

### A.     Medical Practice.

The Debtor's medical practice is primarily comprised of general pediatrics and other specialties.

#### 1.     General Pediatrics.

The Debtor is comprised of a general pediatric group that includes board certified pediatricians and certified pediatric nurse practitioners. In addition, the Debtor offers a pediatric hospitalist program with two physician hospitalists and two pediatric nurse practitioner hospitalists. The Debtor's long-term goal is to transform the general pediatric program into a 100% office-based general pediatric practice that is supplemented by a vigorous hospitalist-based program to take care of the Debtor's hospitalized patients.

#### 2.     Specialties.

The Debtor offers specialists in the areas of Developmental-Behavioral Pediatrics, Audiology-Diagnostics, Behavioral Health, and Hospitalist services.

##### i.     *Developmental-Behavioral Pediatrics*.

The Debtor's behavioral-developmental specialists care for children with developmental difficulties and behavioral changes. The Debtor evaluates each individual patient to determine his/her needs related to the following areas: Attention Deficit Disorder, Attention Deficit Hyperactivity Disorder, cognitive and social developmental delays, Autism, depression and anxiety, learning disorders, delayed speech and language, habit disorders, regulatory disorders pertaining to sleep, or feeding problems, and other behavioral and development problems.

ii. *Audiology.*

The Debtor offers outpatient diagnostic audiology services. This program meets the needs of newborns who have failed their initial hearing screens, children with neurodevelopmental disorders with concurrent hearing problems, and any child with a suspected hearing loss. The Debtor uses state-of-the-art technology to test and treat children with hearing loss. The Debtor works closely with the family, primary care provider, and other professionals to identify and coordinate an individualized treatment plan.

iii. Hospitalist Services. When an unexpected illness or injury requires hospitalization, the Debtor coordinates the patient's care during periods of hospitalization. The Debtor's hospitalists work only in a hospital setting to best coordinate care between the patient's primary pediatrician and other specialists. The Debtor provides hospitalist services for all patients admitted to the following facilities: TriStar Children's Hospital, St. Thomas Hospital – Midtown, and Vanderbilt Children's Hospital.

**B.     Locations.**

The Debtor currently has, or immediately prior to the filing of Chapter 11 had, locations in the Middle Tennessee area at the following locations: (i) Clarksville, (ii) Madison (Skyline), (iii) Nashville Midtown (Centennial Park), (iv) Antioch (Southern Hills), (v) Brentwood, (vi)

Nashville (25th Avenue), (vii) Murfreesboro, (viii) Smyrna, (ix) Lebanon, (xi) Franklin, and (xii) Nolensville Concord Road. Some of these locations have not been profitable since current ownership acquired the Debtor. In connection with its reorganization, the Debtor accordingly intends to reduce the number of its locations so that it will be a sustainable, profitable healthcare provider into the future.

**C.     Payers.**

Capstone Pediatrics currently has contracts with Commercial, Tricare, and TennCare (Medicaid) payers, and expects to continue receiving payments from AIG, Aetna, Amerigroup, Blue Cross Blue Shield, Champus/Tricare, Cigna, Community Health Alliance, Humana, self-payers, United Healthcare, and United Medical Resources. This list is not exclusive. As of the petition date, the Debtor's accounts receivable total approximately $2.7 million, with over half of such receivables being within 31-day terms.

**D.     Partnerships.**

The Debtor has two noteworthy partnerships with TriStar (Division of HCA) and Centerstone.

          i.     *TriStar*.

The Debtor has developed a relationship with the TriStar group of hospitals. The Debtor and TriStar have engaged in monthly meetings with TriStar and shared strategic planning efforts. One of the future efforts includes after-hours care by TriStar doctors embedded within several of the Debtor's sites. In addition, a program will be developed to enable the Debtor's providers to more conveniently utilize TriStar specialists by locating them in areas geographically close to our outlying sites.

5

ii. *Centerstone*.

The Debtor has established a partnership with Centerstone, a national provider of behavioral health care. The Debtor is a part of a SAMSHA grant targeting at risk 0-4 year old children. The Debtor's long-term goal is to embed licensed mental health providers in every site to enable easy access to mental health services at the site level.

### III.    Background on Acquisition of the Debtor

The Debtor acquired the assets of Centennial Pediatrics, PC ("Centennial")[2] on October 31, 2013 in exchange for approximately $6 million. At the time of acquisition, Centennial Pediatrics operated in 11 sites: Brentwood (1); Davidson County (4 offices); Clarksville (1); Wilson County (2); Rutherford County (2); Spring Hill (1). There were approximately 50 practitioners (35 physicians and 15 nurse practitioners/physician assistants). Based on Centennial's books and records, Centennial was profitable for the three years prior to acquisition (2010, 2011, and 2012). In addition, Centennial was trending toward profitability for 2013. The ending income statement for the Debtor for 2013 (thru October 2013) was $17.8 million in revenue and net income of $2.3 million.

The acquisition occurred in the midst of a federal fraud investigation into the conduct of Dr. Edward Hamilton, the former owner of Centennial and prominent Nashville pediatrician. The investigation by the Department of Justice revealed findings that Dr. Hamilton used Centennial, for a five-year period from 2007 to 2012, to "upcode" billings for infant auditory screening exams to TennCare and commercial insurance programs. Specifically, Dr. Hamilton billed for comprehensive exams when only less expensive auditory screenings were performed.

---

[2] The Debtor identified on its petition that it is also known as Centennial. This "aka" designation is not intended to suggest that the Debtor is a successor-in-interest to Centennial. To the contrary, the Debtor acquired only the assets, and not the liabilities, of Centennial. However, based on Centennial being in business for over 20 years, certain individuals or entities within the marketplace still incorrectly refer to the Debtor as Centennial.

6

Dr. Hamilton further "upcoded" billings related to urinalysis screenings. As a result of his misconduct, Dr. Hamilton pled guilty to health care fraud under the False Claims Act. Dr. Hamilton was sentenced to pay criminal restitution of more than $1.6 million and prohibited from participating in all federal health care programs for 20 years. Dr. Hamilton was further ordered to divest himself of all ownership in Centennial.

## IV.     Operation Issues Discovered Upon Acquisition

Upon the Debtor's acquisition of Centennial, it discovered a number of operational problems that were causing instability and unpredictability in the practice. The following problems have been identified as arising from the acquisition and resulting in the Debtor's Chapter 11 filing:

### A.     Administrative Costs.

Centennial did not adhere to standard medical practice administrative cost benchmarks. The administrative overhead was unmanaged and therefore financial statements did not reveal the true financial health of the company.

### B.     IT Infrastructure.

Upon acquisition, Capstone experienced major problems with the stability of the IT infrastructure it acquired. The Debtor was assured by Centennial that all IT issues had been resolved. This was not the case. The Debtor was unexpectedly required to purchase licenses, software, and new servers. In addition, the Debtor had to restructure the layout of its IT infrastructure to permit multi-site functionality.

### C.     Health Benefit Plan.

The Debtor believed it acquired Centennial *and* a stable workforce. However, Centennial suffered from attrition and an inability to recruit proper talent. One reason is because Centennial

offered three expensive benefit packages and an employer participation of 50% of the premium for employee only. Although couched as a "benefit," fewer than 30% of the staff participated because it was simply not affordable. This made it difficult for the Debtor to retain and recruit quality employees. The Debtor implemented a more costly, but more employee-friendly, benefit plan. This is a long-term play, the benefits of which are being, and will continue to be, recouped over time. These benefits are difficult to quantify on a financial statement; instead, the benefits are revealed by analyzing the Debtor from a quality-of-care standpoint.

**D.  Compliance Plan.**

Centennial did not have an adequate compliance plan in place for the practice. The Debtor was forced to contract with a company known as MedSafe to provide regulatory compliance services that include OSHA, HIPAA/HITECH, OIG/CMS Fraud Waste and Abuse, and Corporate Compliance. MedSafe provided on-site practice assessments with recommendations; documentation development including online reference guides, policies, and plans; comprehensive online staff training; and ongoing program maintenance.

**E.  Staff Training and Human Resources.**

Upon acquisition, the Debtor learned that Centennial staff had never received formal or informal training on the various aspects of the practice. The Debtor had to create and implement a training program for virtually all employees. In addition, from an human resources standpoint, the Debtor had to incur the costs of creating job descriptions and employment agreements because Centennial had failed to accomplish this prior to acquisition.

Respectfully Submitted,

/s/ Griffin S. Dunham
Griffin S. Dunham
Elliott Warner Jones
EMERGE LAW, PLC
2021 Richard Jones Road, Suite 240
Nashville, Tennessee 37215
615.953.2682
615.953.2955 (fax)
griffin@emergelaw.net
*Counsel for the Debtor*

**CERTIFICATE OF SERVICE**

On December 21, 2015, the foregoing was served via CM/ECF on all parties consenting to electronic service in this case, and by regular mail, fax, or email (as applicable) to (i) the Debtor's twenty largest creditors, (ii) the Office of the United States Trustee, and (iii) all secured creditors.

/s/ Griffin S. Dunham
Griffin S. Dunham